**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

In re Application of FORENSIC NEWS LLC and
SCOTT STEDMAN for an Order Pursuant to 28
U.S.C. § 1782 to Conduct Discovery for Use in a
Foreign Proceeding.

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS'**
**APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

    I.    Forensic News Investigates And Publishes Reports Highlighting Walter
        Soriano's Vast Web Of Connections To Shadowy Figures Implicated In
        Russian Efforts To Interfere In The 2016 U.S. Presidential Election ............................ 3

    II.   Soriano Threatens Petitioners With Litigation And Ultimately Sues Them In
        England Despite Their Lack Of Any Connections To That Forum ............................... 7

LEGAL STANDARD ................................................................................................... 10

ARGUMENT ............................................................................................................... 11

    I.    Petitioners' Application Satisfies The Statutory Requirements For Discovery
        Pursuant To 28 U.S.C. § 1782 .................................................................................... 12

    II.   The *Intel* Discretionary Factors All Favor Granting Petitioner's Application .............. 14

CONCLUSION ............................................................................................................. 19

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Accent Delight Int'l Ltd.*,
   791 F. App'x 247 (2d Cir. 2019) ..........................................................................17

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017)..............................................................................13

*Ahmad Hamad Algosaibi & Bros. v. Standard Chartered Int'l (USA) Ltd.*,
   785 F. Supp. 2d 434 (S.D.N.Y. 2011)...........................................................12, 13

*In re Application of Gorsoan Ltd. & Gazprombank OJSC*,
   2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014) .....................................................15

*In re Application of Patokh Chodiev*,
   2021 WL 3270042 (S.D.N.Y. July 30, 2021) ......................................................16

*In re Batbold*,
   2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021) .......................................................15

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998)............................................................10, 11, 12, 17

*In re Bloomfield Inv. Res. Corp.*,
   2018 WL 6418421 (E.D.N.Y. Dec. 6, 2018) ..........................................14, 15, 16

*In re BNP Paribas Jersey Tr. Corp.*,
   2018 WL 895675 (S.D.N.Y. Feb. 14, 2018).......................................................16

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012)...............................................................................16

*In re Del Valle Ruiz*,
   342 F. Supp. 3d 448 (S.D.N.Y 2018)................................................................10

*In re Del Valle Ruiz*,
   939 F.3d 520 (2d Cir. 2019).......................................................................10, 16

*In re Doosan Heavy Indus. & Constr. Co.*,
   2020 WL 1864903 (E.D.N.Y. Apr. 14, 2020) ..............................................15, 18

*Euromepa S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995)........................................................................15, 19

*Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*,
27 F.4th 136 (2d Cir. 2022) ...................................................16

*Goenechea v. Davidoff*,
2016 WL 560689 (D. Md. Feb. 11, 2016) ........................................2, 18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004)................................................. *passim*

*In re JSC BTA Bank*,
2021 WL 6111916 (S.D.N.Y. Dec. 27, 2021) .......................................16

*In re Kreke Immobilien*,
2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) .........................................16

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
62 F. Supp. 3d 358 (S.D.N.Y. 2014).................................................16

*In re Mariani*,
2020 WL 1887855 (S.D.N.Y. Apr. 16, 2020)........................................12

*Mees v. Buiter*,
793 F. 3d 291 (2d Cir. 2015)...............................................13, 14, 18, 19

*Minatec Fin. S.A.R.L. v. SI Grp. Inc.*,
2008 WL 3884374 (N.D.N.Y Aug. 18, 2008) .......................................17

*Trout Point Lodge, Ltd. v. Handshoe*,
729 F.3d 481 (5th Cir. 2003) .........................................................2

*In re Vale S.A.*,
2020 WL 4048669 (S.D.N.Y. July 20, 2020) .......................................16

**Statutes**

28 U.S.C. § 1782.................................................................. *passim*

28 U.S.C. § 4101..................................................................2

English Defamation Act 2013 § 2...................................................13

N.Y. Civ. Rights Law § 76-a .......................................................19

Pub. L. 111-223, § 2, 124 Stat. 2380 (2010).......................................2

# TABLE OF AUTHORITIES

(continued)

Page(s)

**Rules**

Fed. R. Civ. P. 26 ................................................................................................................18

**INTRODUCTION**

Forensic News LLC and its journalist-founder, Scott Stedman (together, "Petitioners"),

seek this Court's leave under 28 U.S.C. § 1782 to take discovery from Richard Frankel, an

individual who resides in this district, to aid their defense of a baseless defamation action

brought against them before a foreign tribunal, Her Majesty's High Court of Justice in London.

The case, *Soriano v. Forensic News LLC*, Claim No. QB-2020-002450 (the "English Defamation

Action"), is an attack on American free speech and journalistic values brought by Walter

Soriano, a British-Israeli "security consultant" with ties to the Russian oligarchy.

Forensic News' mission is to deliver original long-form journalism focused on national

security, espionage, corporate, and political issues. Forensic News learned of Soriano when a

*Politico* report identified him as a person of interest in the Senate Intelligence Committee's

investigation into Russian interference in the 2016 U.S. presidential election. Forensic News

picked up on the *Politico* report and ran with it, ultimately discovering and reporting on a web of

shadowy connections and secretive dealings with Russian oligarchs and others, largely forged

through Soriano's security consultancy USG Security Limited ("USG"). Forensic News'

investigations culminated in the publication of multiple news articles about Soriano and his ties

to core figures associated with alleged Russian election interference, including General Michael

Flynn and Vladimir Putin confidant Oleg Deripaska. Frankel, a former aide to Flynn who left

employment in the federal government in 2016 to work for USG and Soriano, likely has in-depth

knowledge of USG's activities and connections—including many of the activities about which

Forensic News reported in 2019 and 2020 relating to Russian election interference and the

Russian oligarchy. Frankel's documents and testimony will thus be relevant to the truth of

Forensic News' reporting, critical to Petitioners' defense in the English Defamation Action.

Although Forensic News is based in the United States, is staffed by American journalists, and reports on issues of concern to the American public (its primary audience), Soriano cracked open the well-worn playbook of foreign oligarchs unwilling to face the crucible of a full and fair American-style press.  He filed suit against Forensic News, Mr. Stedman, and other contributing journalists in England—a jurisdiction where Forensic News does not operate and Mr. Stedman has never even visited, and which has far less robust speech protections than the United States.  As Congress has observed, such "libel tourism" is intended to "'obstruct[]' the free expression rights of domestic authors and publishers" and "'chill[]' domestic citizens' First Amendment . . . interest in 'receiving information on matters of importance'" by "'seeking out foreign jurisdictions that do not provide the full extent of free-speech protections . . . that are available in the United States.'"  *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 487 (5th Cir. 2003) (quoting Findings to Pub. L. 111-223, § 2, 124 Stat. 2380 (2010)).  Congress has ensured that any judgment Soriano procures will ultimately be unenforceable against Petitioners in the United States through the Securing Protection of Our Enduring and Established Constitutional Heritage ("SPEECH") Act of 2010.  That statute broadly renders unenforceable most foreign judgments for defamation or associated claims, including strike suits like Soriano's designed to chill reporting on matters of public concern.  *See, e.g.*, 28 U.S.C. § 4101 *et. seq.*

But the case against Petitioners in England is ongoing, and Petitioners therefore seek discovery from this Court to aid them in their defense.  *See Goenechea v. Davidoff*, 2016 WL 560689, at *3 (D. Md. Feb. 11, 2016) (granting Section 1782 application despite possibility that foreign judgment would be unenforceable under the SPEECH Act).  The discovery Petitioners seek pertains to two critical components of their defense of the English Defamation Action.  *First*, Petitioners can defeat Soriano's claims on the merits if they prove their reporting was

truthful and accurate.  *Second*, Petitioners will likely have the opportunity to cross-examine

Soriano during trial in England, putting his credibility directly at issue.  Any evidence Petitioners

can recover that allows them to challenge Soriano's credibility plainly aids in Petitioners'

defense.  Frankel, as a former aide to Flynn and employee of USG, likely has knowledge

relevant to each of these defenses.

This Court should grant Section 1782 relief for two primary reasons.  *First*, Petitioners'

application meets each of the statutory prerequisites the Supreme Court articulated in *Intel Corp.*

*v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246–47 (2004).  Petitioners are defendants in a

foreign action, seek discovery from an individual who resides or is found in this judicial district,

and seek discovery for use in a foreign proceeding.  *Second*, each of the discretionary factors the

Supreme Court articulated in *Intel* favors awarding discovery.  *Id.* at 264–65.  Frankel is not

party to the English Defamation Action, the High Court is receptive to U.S. judicial assistance,

this application does not seek to circumvent any English proof-gathering restrictions, and the

discovery sought will not be unduly burdensome.

It is unfortunate Petitioners even need to fight Soriano's lawsuit—an action that would be

resoundingly defeated and subject to anti-SLAPP relief had it been brought in the United States

as it should have been.  But Petitioners have no choice.  Consistent with the aims of Congress in

adopting the SPEECH Act and Section 1782, Petitioners therefore respectfully ask this Court to

aid them in confirming their reporting to defend against the English Defamation Action.

**FACTUAL BACKGROUND**

I.   **Forensic News Investigates And Publishes Reports Highlighting Walter Soriano's Vast Web Of Connections To Shadowy Figures Implicated In Russian Efforts To Interfere In The 2016 U.S. Presidential Election**

Forensic News is an independent news outlet based in the United States that covers

national security, political, and legal issues.  *See* Declaration of Patrick Doris ("Doris Decl.") ¶ 4.

Scott Stedman founded Forensic News in 2019 to provide free access to well-sourced, long-form

investigative journalism.  *See* Ex. 2 at 1–3.[1]  Mr. Stedman is an investigative journalist whose

work has been cited in The Washington Post, BBC, CNN, the Guardian, and VICE.  Ex. 3 at 1.

 Forensic News first became interested in Walter Soriano after he was invited to testify

before the U.S. Senate Intelligence Committee about potential Russian interference with the

2016 U.S. presidential election.  *See* Ex. 4 at 44; Ex. 5 at 2.  Specifically, the Senate Intelligence

Committee requested an interview and documents relating to any communications Soriano had

with over a dozen individuals and companies, including Russian oligarch Oleg Deripaska,

General Michael Flynn, Paul Manafort, and Steve Bannon.  *See* Ex. 4 at 6–7; Ex. 5 at 2.  Soriano

never responded to the Committee's request.  *See* Ex. 4 at 51.

 Shortly thereafter, Forensic News began publishing a series of articles about Soriano.

The reporting was groundbreaking.  Over the course of its reporting series, Forensic News

uncovered Soriano's deep ties to the power centers of the Israeli and Russian governments.  *See*

Ex. 4 at 4, 9–11.  These connections, usually forged through Soriano's private security firm

USG, *see* Ex. 6 at 2–3, became the focus of Forensic News' reporting.

 In the first articles in its series, Forensic News detailed Soriano's extensive relationships

with Russian oligarchs and their agents, including, most prominently, Oleg Deripaska.

Deripaska is an aluminum magnate with close ties to Russian president Vladimir Putin and Paul

Manafort and was the subject of intense scrutiny for his involvement in Russia's 2016 election

interference activities.  *See* Ex. 4 at 49.  In 2018, the U.S. Treasury Department imposed

sanctions on Deripaska and his company, explaining that he had "benefit[ted] from the Putin

---

[1] Citations to "Ex. _" refer to exhibits to the concurrently filed Declaration of Anne Champion.

regime and play[ed] a key role in advancing Russia's malign activities." *See* Ex. 7 at 1–4.

Forensic News discovered through Russian court documents that Deripaska's aviation company

contracted with Soriano's USG to give it "direct control" of the Sochi International Airport

during the Sochi Winter Olympics in 2014. *See* Ex. 4 at 4. As one of Forensic News' sources

explained, "airport security during the Olympics is an extremely sensitive issue . . . [s]o, it

sounds like the Kremlin very much trusted USG Security." *See id.* at 6. The same source noted

that "consulting" contracts, such as the one between Deripaska's company and USG, "[are] a

standard way to hide kickbacks and other corrupt payments." *See id.*

Forensic News reported other ties between Soriano and Deripaska. For example,

Forensic News detailed the story of Nastya Rybka. Rybka is a Belarusian woman who was in a

romantic relationship with Deripaska. *See* Ex. 4 at 57–58. In 2018, she claimed to have

audiotapes showing coordination between the Trump campaign and Russia. *See id.* After she

published a video of Deripaska discussing U.S. relations with the Russian Deputy Prime

Minister, Rybka was arrested in Thailand and extradited back to Russia. *See id.* Once returned,

she was forced to publicly apologize to Deripaska. *See id.* at 58. As Forensic News reported,

Soriano assisted Deripaska in his efforts to silence Rybka and prevent her from releasing

information. *See id.*

Forensic News also outlined Soriano's relationships with Russian oligarchs Roman

Abramovich and Dmitry Rybolovlev. *See* Ex. 4 at 8. Abramovich is one of the wealthiest

people in Russia and a friend of Vladimir Putin. *See* Ex. 8 at 4–5. He once had such a close

relationship to Jared Kushner and Ivanka Trump that it had to be disclosed in securities clearance

forms Kushner and Trump filed with the White House. *See id.* Rybolovlev is another one of the

wealthiest people in Russia. *See* Ex. 4 at 8. In 2008, he purchased Donald Trump's Florida

mansion for $95 million—more than double what Trump had paid just three years earlier.  *See id.*

Both Abramovich and Rybolovlev hired Soriano's USG to assist in separate legal disputes.  *See* Ex. 4 at 8; Ex. 6 at 3.  Based on a sworn affidavit from Israeli journalist Ravi Drucker (whom Soriano also sued for libel), Forensic News reported that USG offered Abramovich and Rybolovlev "sophisticated tracking, data collection and data acquisition through various technological means, such as hacking, eavesdropping, and more."  *See* Ex. 4 at 8.  Further, citing documents obtained by a French journalist, Forensic News explained that Rybolovlev separately hired USG in mid-2016 to investigate a former coach and player of his soccer club, AS Monaco.  *See id.*  And according to the same documents, two years later, in 2018, Rybolovlev and his attorney were both charged by prosecutors in Monaco as part of a corruption probe.  *See id.*

Beyond exposing Soriano's ties to the Russian elite, Forensic News detailed Soriano's connections to high-ranking Israeli government officials and intelligence officers.  *See* Ex. 4 at 3.  For instance, Forensic News reported that it had learned, in part through a 2018 Israeli news expose, that Soriano had been a confidant of former Israeli Prime Minister Benjamin Netanyahu for decades.  *See id.*  Forensic News published email correspondence obtained by the Israeli journalist Raviv Drucker showing Soriano and a Netanyahu government official discussing the scheduling of a meeting between Soriano and Netanyahu, just months before Netanyahu became Prime Minister for the second time.  *See id.* at 9.  Forensic News also found, in testimony from a July 2019 Israeli court proceeding, that Soriano had once claimed Netanyahu was a "partner" in USG.  *See id.* at 10.  In addition to these direct ties to Netanyahu, Forensic News reported that Soriano had a relationship with Isaac Molho, Netanyahu's longtime confidant and attorney.  *See*

*id.* Indeed, one set of USG business documents obtained by Forensic News revealed that Molho owned a portion of USG. *See id.* Another document, first published by Drucker, showed that USG paid Molho almost $200,000 in finder's fees for a contract he facilitated with *Altos Hornos de Mexico* (AHMSA), the largest integrated steel plant in Mexico. *See id.* Soriano later orchestrated a meeting between the Chairman of AHMSA and Netanyahu. *See id.*

In sum, Petitioners' reporting was dogged and thorough. Petitioners exposed significant and suspicious webs of contacts all linked through Soriano and USG. And they raised serious questions on significant matters of public concern. Petitioners' reporting represented the best of traditional, shoe-leather investigative journalism—the very type of journalism the First Amendment was meant to protect.

## II.    Soriano Threatens Petitioners With Litigation And Ultimately Sues Them In England Despite Their Lack Of Any Connections To That Forum

As Forensic News revealed more of Soriano's relationships with individuals and entities tied to Russian election interference activities, Soriano contacted Petitioners through counsel. He threatened to sue Forensic News and its journalists. *See* Ex. 4 at 53. And he demanded they cease their reporting. *See id.* at 32. Soriano's tactics were not new—he has repeatedly tried to use litigation to silence journalists in the past. By way of example, Soriano brought libel claims against two investigative journalists and multiple Israeli publications in Israeli court. *See id.* at 63; Ex. 10 at 2. He challenged reports that he spearheaded efforts to collect compromising information on police investigators who were investigating then-Israeli Prime Minister Benjamin Netanyahu. *See* Ex. 4 at 62. The journalists ultimately prevailed. *See id.* at 67. Soriano also sued Twitter for hosting news stories that he perceived as unflattering. *See id.* at 62.

Despite Soriano's threats, Forensic News stood by its reporting. It refused to be intimidated. And it declined either to cease its reporting or to self-censor by taking down its

groundbreaking pieces.

On July 14, 2020, Soriano initiated legal proceedings in the High Court of Justice, Queen's Bench Division, in London.  Doris Decl. ¶¶ 1, 8.  Soriano named as defendants Forensic News and four contributing journalists (including Mr. Stedman) who are American citizens and reside in the United States.  *Id.* ¶¶ 4, 7.[2]  He asserted claims for data protection under the General Data Protection Regulation ("GDPR"), malicious falsehood, harassment, misuse of private information, and libel.  *Id.* ¶ 8; *see generally* Ex. 11.  Soriano sought not only injunctive relief but also monetary damages, including "aggravated damages."  *See* Ex. 11 at 29.

Soriano's claims focused primarily on eight publications—including six investigative articles, one podcast, and a published transcript of the podcast—that Petitioners authored, published, or participated in between 2019 and 2020.  *See* Ex. 11 at 3–8; Doris Decl. ¶ 8. According to Soriano, the publications falsely stated or implied (among other things) that he (i) was involved in a Russian conspiracy to interfere with the 2016 U.S. presidential election; (ii) served as a middleman between Russia and a network of Israeli hacking and surveillance firms; (iii) engages in money laundering through Playland Investments, LLC, a real estate venture in Florida; and (iv) makes or has made illegal arrangements for Russian oligarchs, including Oleg Deripaska and Dmitry Rybolovlev, and for then-Israeli Prime Minister Benjamin Netanyahu.  *See* Ex. 11 ¶¶ 11–12, 22, 29.  Soriano denied, for example, that he had ever "paid off a Russian sex worker [*i.e.*, the Belarusian woman Nastya Rybka] who threatened to release an audio tape of her relationship with Oleg Deripaska."  *See id.* ¶¶ 12, 29.

Because Petitioners reside in the United States, Soriano had to apply for the High Court's

---

[2]  Soriano also brought claims against Richard Silverstein, a journalist unaffiliated with Forensic News.  *See* Doris Decl. ¶ 7.

permission to serve them in the United States. *See* Doris Decl. ¶ 9. Petitioners opposed the application, arguing that the High Court lacked jurisdiction. *Id.* ¶ 10. On January 15, 2021, the High Court issued a judgment denying Soriano permission to serve Petitioners with his claims for GDPR violations, malicious falsehood, and harassment. *See id.* ¶ 11. The High Court concluded that Soriano failed to demonstrate a real prospect of success on any of these claims, and that certain claims were "based on little more than wild speculation." Ex. 12 ¶¶ 69, 96–99, 103. But the High Court allowed Soriano to serve Petitioners in the United States with claims for libel and misuse of private information. *See* Doris Decl. ¶ 11; *see also* Ex. 12 ¶¶ 164, 169. The High Court also concluded that the courts of England and Wales were the appropriate forum for trial of these claims. Ex. 12 ¶ 164.

The parties cross-appealed. *See* Doris Decl. ¶ 12. On December 21, 2021, the Court of Appeal affirmed the High Court's decision to let Soriano serve his claims for libel and misuse of private information. *See id.*; Ex. 13 ¶¶ 71–72, 123. It also reversed the High Court's dismissal of the GDPR data protection claim, holding based on the preliminary record that Forensic News' activity fell within the territorial scope of the GDPR. *See* Doris Decl. ¶ 12; Ex. 13 ¶¶ 95, 103–04, 123. The appellate court's ruling on the GDPR claim has been called a "landmark." Ex. 14 at 1. Because Forensic News' connections to the United Kingdom and the European Union are so sparse, commentators have noted that the appellate court's holding subjecting Forensic News to the GDPR's territorial reach "will have far-reaching implications for all US media corporations." *Id.* As Soriano's counsel proclaimed, the appellate decision "is of historic importance to all US media: if you publish an article about a UK citizen, even if you are physically only based in the US, you may be sued in the UK for breach of data protection laws." Ex. 15 at 1.

Merits proceedings on Soriano's three remaining claims are underway. Those claims include Soriano's assertions that the defendants committed libel, misused private information, and violated the GDPR. Doris Decl. ¶¶ 12, 14. Relevant to this Section 1782 application, the defendants in the English Defamation Action can defeat Soriano's claims by demonstrating that the statements contained in their reporting were true and accurate. *See* Doris Decl. ¶¶ 25, 27. In English defamation proceedings, the defendant has the evidentiary burden of proof with respect to a truth defense. *Id.* ¶ 25. In addition, Petitioners expect Soriano to testify at trial in the English Defamation Action and to deny the allegations made in Forensic News' reporting. *See id.* ¶¶ 23, 27. Soriano's credibility will therefore be directly at issue, and Petitioners will have a greater chance of success if they can persuade the High Court not to believe Soriano's testimony following vigorous cross-examination. *Id.* ¶ 27.

Petitioners filed their Defence in the English Defamation Action on March 16, 2022. Doris Decl. ¶ 15. They will shortly enter the "disclosure" or discovery phase of the litigation. *See id.* They submit this Section 1782 application to aid in their defense and are considering making additional applications as well.

## LEGAL STANDARD

Section 1782(a) provides that a federal district court may order discovery for use in a foreign or international tribunal from persons residing or found in the court's judicial district. 28 U.S.C. § 1782. Section 1782 was designed "to liberalize the assistance given to foreign and international tribunals." *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 453 (S.D.N.Y 2018), *aff'd*, 939 F.3d 520 (2d Cir. 2019). Where the information sought is relevant, it is "presumptively discoverable under § 1782." *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998). "Consistent with the statute's modest *prima facie* elements and Congress's goal of providing equitable and

efficacious discovery procedures, district courts should treat relevant materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *Id.* at 195.

Section 1782(a) has three *prima facie* statutory requirements before a court may award discovery. *First*, the applicant must be an "interested person" in the foreign proceeding. *Intel*, 542 U.S. at 246. *Second*, the person from whom discovery is sought must reside in or be found in this district. *Id.* at 241. *Third*, the discovery must be for use in a proceeding in a foreign tribunal. *Id.* When those requirements are met, the decision to grant the request rests with the district court, whose discretion is guided by four factors. *Id.* at 260–61. Specifically, courts consider: (i) whether the person from whom discovery is requested is a party to the foreign proceeding; (ii) the nature of the foreign tribunal, the character of the foreign proceeding, and the tribunal's receptivity to the federal court's assistance; (iii) whether the applicant is attempting to circumvent discovery restrictions or policies of the foreign tribunal; and (iv) whether the discovery sought is unduly intrusive or burdensome. *Id.* at 264–65.

## ARGUMENT

Petitioners seek discovery from former USG employee Richard Frankel. USG employed Frankel during many of the events discussed in Petitioners' reporting. USG is at the center of virtually all of Soriano's connections to Deripaska, Abramovich, Rybolovlev, Netanyahu, Molho, and others. As an important employee of USG during the relevant time period, Frankel likely possesses information that would prove the accuracy of Petitioners' reporting on these connections. Frankel also likely possesses information about Soriano's connection to Michael Flynn (Frankel's former boss) and Flynn's involvement in the Russian election interference activities about which Forensic News reported. Any of this information would directly support

the veracity of Petitioners' reporting on Soriano's vast web of connections. The discovery would thus help Petitioners defeat the strike suit Soriano filed against them in England—a suit that would not even come close to prevailing in an American court.

As explained further below, Petitioners' application satisfies each of the statutory and discretionary factors relevant to assessing whether to award Section 1782 relief. This Court should grant Petitioners' application in full.

## I. Petitioners' Application Satisfies The Statutory Requirements For Discovery Pursuant To 28 U.S.C. § 1782

This application easily meets the *prima facie* statutory requirements set forth in Section 1782. *See In re Bayer*, 146 F.3d at 193. We take each in turn.

*1. Petitioners Are Interested Persons.* First, Petitioners are "interested persons" in a foreign proceeding in England. Specifically, they are defendants. As the Supreme Court explained in *Intel*, "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." 542 U.S. at 256. As defendants in the English Defamation Action, Petitioners are undisputedly "interested person[s]" who can seek Section 1782 discovery.

*2. Target Residing In Or Found In This District.* Second, the discovery target resides in or is found within the Eastern District of New York. Frankel resides in Port Washington, New York, which is located in Nassau County. *See* Ex. 16 at 1. His Port Washington address is also associated with his voter registration and attorney's license. *See id.*; *see also* Ex. 17 at 1. Frankel also has his own consulting firm located in Port Washington, at an address listed on the firm's website as well as on his New York attorney registration. Ex. 18 at 6; *see In re Mariani*, 2020 WL 1887855, at *1 (S.D.N.Y. Apr. 16, 2020) (finding party whose principal place of business was within the district to "reside[]" in the district); *Ahmad Hamad Algosaibi & Bros. v.*

*Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) (finding parties who "have offices and do business" within the district to "reside" in the district). Petitioners, therefore, have established the second statutory factor: Frankel is found within this judicial district.

    ***3. The Discovery Sought Is For Use In A Foreign Proceeding.*** Petitioners satisfy Section 1782's final statutory requirement because they intend to use this discovery in the proceedings against them in the United Kingdom. To meet the "for use in a foreign tribunal" requirement, the applicant need only demonstrate the "ability to inject the requested information into a foreign proceeding" and that the "requested discovery is something that will be employed with some advantage or serve some use in the proceeding." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017) (internal quotations omitted). There is no requirement that the discovery sought be strictly necessary for the an applicant's case, so long as the materials can "increase her chances of success." *Mees v. Buiter*, 793 F. 3d 291, 299 (2d Cir. 2015).

    Here, the discovery sought would plainly increase Petitioners' "chances of success" in that proceeding—in fact, it may well be dispositive of certain claims. *See* Doris Decl. ¶¶ 25, 27. One of Petitioners' primary defenses to the claims against them in the English Defamation Action is that the challenged statements are true. Under English law, "it is a defence to an action for defamation for the defendant to show that the imputation conveyed by the statement complained of is substantially true." *Id.* ¶ 25 n.2 (quoting Section 2 of the English Defamation Act 2013). The discovery Petitioners seek will support the truth of many statements in Forensic News' reporting that Soriano challenges in the English Defamation Action. It will refute Soriano's allegations, for example, that Petitioners falsely stated he has "contact[s] with the Kremlin . . . [and Vladimir] Putin," Ex. 11 ¶ 22.2.1; "worked directly for Oleg Deripaska and

Israeli Prime Minister Benjamin Netanyahu," *id.* ¶ 12.8.1; and "directly employed a man, Maxim Skachko, who is guilty of embezzlement," *id.* ¶ 12.5.1.  The discovery will also help Petitioners challenge Soriano's credibility should he be cross-examined at trial in the English Defamation Action.  *See* Doris Decl. ¶ 27.  Soriano has offered blanket denials of the claims made in Forensic News' reporting.  *See* Ex. 11 ¶¶ 22.1-22.7; Doris Decl. ¶ 27.  Any facts that damage Soriano's credibility and aid Petitioners' cross-examination will help Petitioners prevail in the ultimate trial in the English Defamation Action.

\* \* \*

In sum, Petitioners satisfy the statutory pre-requisites to awarding Section 1782 relief. Petitioners are defendants in a foreign case, and they seek discovery for use in a foreign proceeding from a resident of this judicial district.  This Court should award Section 1782 relief.

## II.    The *Intel* Discretionary Factors All Favor Granting Petitioner's Application

The four discretionary factors the Supreme Court identified in *Intel* also weigh strongly in favor of granting Petitioners' Section 1782 application.  *See Intel*, 542 U.S. at 264–65; *Mees*, 793 F.3d at 298.  We address each in turn.

*1.    The Discovery Target Is Not A "Participant" In the Foreign Action.*  The first *Intel* factor considers whether "the person from whom discovery is sought is a participant in the foreign proceeding."  *Intel*, 542 U.S. at 244.  That factor weighs in favor of granting discovery here.  Frankel is neither a party to nor a participant in the English action.  *See* Doris Decl. ¶¶ 4–7, 22.  And because Frankel "resides in the United States and is not a party" to the English proceeding, the High Court "does not have the jurisdiction to . . . obtain his testimony [or] any documents sought" from him.  *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at \*4 (E.D.N.Y. Dec. 6, 2018); *see* Doris Decl. ¶ 22.  This factor therefore weighs heavily in favor of

granting Petitioners' application.  *See In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at \*4; *see also In re Doosan Heavy Indus. & Constr. Co.*, 2020 WL 1864903, at \*2 (E.D.N.Y. Apr. 14, 2020).

### 2. The English Court Is Receptive to U.S. Discovery Assistance.

The second *Intel* factor assesses "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel*, 542 U.S. at 264.  "Absent specific directions to the contrary from a foreign forum, [Section 1782]'s underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995); *see also In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at \*5 ("The Second Circuit has instructed district courts to be liberal in permitting requested discovery.").  Courts therefore presume that a foreign forum will be receptive to U.S. assistance unless there is "*authoritative proof*" that the foreign forum "would reject evidence obtained with the aid of [S]ection 1782." *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at \*5 (emphasis added); *see In re Doosan*, 2020 WL 1864903, at \*2 ("[T]he Court has no reason to believe that Egypt . . . is averse to receiving assistance from the United States."); *In re Application of Gorsoan Ltd. & Gazprombank OJSC*, 2014 WL 7232262, at \*7 (S.D.N.Y. Dec. 10, 2014) ("[T]here is no evidence that Cyprus has been 'expressly unreceptive' to U.S. discovery.").

The second *Intel* factor again clearly favors Petitioners.  The High Court is amenable to accepting evidence procured through U.S. discovery mechanisms.  *See* Doris Decl. ¶¶ 30–33.  In fact, federal district courts have consistently found that "[t]he courts in the United Kingdom . . . are [] receptive to Section 1782 discovery." *In re Batbold*, 2021 WL 4596536, at \*4 (S.D.N.Y.

Oct. 6, 2021); *see, e.g.*, *In re JSC BTA Bank*, 2021 WL 6111916, at *4 (S.D.N.Y. Dec. 27, 2021); *In re Application of Patokh Chodiev*, 2021 WL 3270042, at *2 (S.D.N.Y. July 30, 2021); *In re Vale S.A.*, 2020 WL 4048669, at *5 (S.D.N.Y. July 20, 2020); *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 362 (S.D.N.Y. 2014). And "the regularity with which U.S. courts grant similar Section 1782 discovery requests for [English] litigation . . . suggests that there is little potential offensiveness to such grants." *In re Bloomfield Inv. Res. Corp.*, 2018 WL 6418421, at *6.

**3. *No Attempt to Circumvent Foreign Proof-Gathering Restrictions.*** The third *Intel* factor examines "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. An applicant attempts to "circumvent" foreign proof-gathering restrictions only when it "uses a § 1782 application to avoid measures that are *intended* to restrict certain means of gathering or using evidence." *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 153 (2d Cir. 2022) (holding that a U.S.-Nigeria treaty did not qualify as such a measure). This factor similarly weighs in favor of granting Petitioners' discovery application.

Importantly, the third *Intel* factor is "not the same as a foreign discoverability requirement." *In re Kreke Immobilien*, 2013 WL 5966916, at *6 (S.D.N.Y. Nov. 8, 2013), *abrogated on other grounds by In re del Valle Ruiz*, 939 F.3d 520. "Courts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . . or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding." *In re BNP Paribas Jersey Tr. Corp.*, 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018). Moreover, the requested discovery need not be admissible abroad. *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 77 (2d Cir. 2012). Rather,

when evaluating the third *Intel* factor, courts consider whether the petitioner seeks the discovery in good faith. *Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, 2008 WL 3884374, at *8 (N.D.N.Y Aug. 18, 2008).

Here, Petitioners make their discovery requests in a good-faith effort to obtain information essential to one of their main defenses in the English Defamation Action: Petitioners' reporting about Soriano was truthful and accurate. Evidence substantiating that defense would help Petitioners defeat both the libel and GDPR claims pending against them. Doris Decl. ¶¶ 24–26, 35. Petitioners' discovery request seeks information located in this district (or at least under Mr. Frankel's control) regarding work performed by Soriano and his security firm USG—the specific topics covered in Petitioners' reporting and disparaged as "libel" by Soriano. The United Kingdom does not have any law or policy that would bar such relevant evidence. *See id.* ¶ 31. To the contrary, if Frankel were subject to the High Court's jurisdiction (and to Petitioners' knowledge he is not), Petitioners could likely have obtained their requested discovery from him in England. *Id.* ¶¶ 17–22. In any event, even if Petitioners could not have obtained this discovery directly in the English proceeding, this factor would still favor Petitioners because "'there is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use.'" *Intel*, 542 U.S. at 261 (citing *In re Bayer*, 146 F.3d at 194); *see In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d Cir. 2019). Once again, the third *Intel* factor strongly favors Section 1782 relief here.

**4. The Requested Discovery is Relevant and Not Unduly Burdensome.** The fourth *Intel* factor examines whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. "[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the

Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. That is, the Court should consider factors including "the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b).

Here, the discovery sought is unquestionably relevant to the English Defamation Proceeding. It bears directly on the truth and accuracy of Petitioners' reporting—the most critical issue in the English Defamation Proceeding—and on Soriano's credibility. *See* Doris Decl. ¶¶ 24–28, 34–35.[3]

Comparing the parties' relative access to the information also weighs in favor of granting the request. The information sought is currently unavailable to Petitioners, but within Frankel's control. *See* Ex. 1, Attachment A at 3 (instructing Frankel to provide only those documents in his "actual or constructive possession, custody, or control"). The documents Petitioners seek should be easily accessible to Frankel. And because the request is tailored to information about specific partners, employees, and clients of USG, it is not unduly burdensome. *See id.*, Attachment A at 6; *In re Doosan*, 2020 WL 1864903, at *2 ("[T]he discovery sought is neither burdensome nor intrusive, as it targets only documents and testimony clarifying the nature of the business relationship between Liberty Maritime and KGLPI."). Nor is there reason to believe that any documents or testimony Petitioners seek would be categorically protected by attorney-client or work-product privilege.

In contrast, to deny Petitioners' motion would place an enormous burden on their

---

[3] That any ultimate judgment will be unenforceable in the United States under the SPEECH Act does not render discovery inappropriate. *See Goenechea*, 2016 WL 560689, at *3 (granting Section 1782 application despite possibility that foreign judgment would be unenforceable under SPEECH Act). The SPEECH Act affects only judgments enforced *in* the United States. Petitioners have a right to defend the English Defamation Action to prevent the imposition of a judgment that might be enforceable elsewhere.

shoulders.  Under English law, parties accused of defamation bear the burden of proving the truth of their statements.  This is the opposite of American evidentiary presumptions—particularly in defamation cases, where plaintiffs in New York must prove falsity by clear and convincing evidence.  *See* N.Y. Civ. Rights Law § 76-a.  To shoulder this burden, Petitioners must present evidence proving the truth of their statements and debunking Soriano's blanket denials.  Doing so requires procuring evidence from sources like Frankel and other Soriano affiliates.

 For these reasons, the fourth and final *Intel* factor also strongly weighs in Petitioners' favor.[4]

* * *

In conclusion, each of the four discretionary *Intel* factors weigh strongly in favor of granting Petitioners' application.  Frankel is not a party to the English Defamation Action, English courts are receptive to U.S. discovery assistance, Petitioners do not seek to circumvent any English discovery restrictions with their request, and the discovery sought is neither unduly burdensome nor intrusive.  This Court should award Section 1782 relief.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court grant this Application in its entirety and grant Petitioners leave to serve on Richard Frankel a subpoena substantially similar to that attached as Exhibit 1 to the Declaration of Anne Champion.

---

[4]  In any event, the Second Circuit has instructed that even if "a district court finds that a discovery request is overbroad, before denying . . . [a Section 1782] application it should ordinarily consider whether that defect could be cured through a limited grant of discovery."  *Mees*, 793 F.3d at 302; *see also Euromepa S.A.*, 51 F.3d at 1101 ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright.").  Any doubts this Court has as to the scope of the discovery can be addressed in the context of a motion to compel or quash, rather than in this application seeking leave merely to serve Petitioners' proposed subpoena.

Dated: March 31, 2022

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Anne Champion*
Anne Champion
Lee R. Crain
Erica Sollazzo Payne
Cate McCaffrey
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166-0193
Telephone: (212) 351-3883
Facsimile: (212) 351-5303

*Counsel for Petitioners Forensic News LLC and Scott Stedman*