# EXHIBIT 11

Claim No. QB-2020-002450

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>QUEEN'S BENCH DIVISION</u>
<u>MEDIA AND COMMUNICATIONS LIST</u>

B E T W E E N:-

### MR WALTER TZVI SORIANO

<u>Claimant</u>

-and-

### (1) FORENSIC NEWS LLC
### (2) MR SCOTT STEDMAN
### (3) MR ERIC LEVAI
### (4) MR JESS COLEMAN
### (5) MR ROBERT DENAULT
### (6) MR RICHARD SILVERSTEIN

<u>Defendants</u>

---

### PARTICULARS OF CLAIM

---

**PARTIES**

1.  The Claimant is a British citizen, naturalized in May 2009 after moving to the United Kingdom in September 2003 (although he has also kept dual Israeli citizenship). He is both domiciled and habitually-resident in London, and is domiciled in the UK for tax purposes. He is the director of seven English companies, all of which are domiciled in London, and his professional life is centred in London. His immediate family – eight of his nine children, and all of his seven grandchildren – are based in the UK, with his ninth child due to move to the UK from Israel in the near future. The UK is the 'Member State' which is the centre of his interests for the purposes of the Brussels Recast Regulation which continues to apply to claims issued in England & Wales prior to 31 December 2020 by virtue of the EU-UK Withdrawal Agreement and domestic implementing legislation.

2.  The First Defendant is a company registered in the State of California, USA, with company file number 201913510586. Its registered address is 1900 Aspen Circle, Fullerton, CA 92835, being the home address of the Second Defendant's parents, John and Alisa Stedman, where he also lives. The First Defendant was founded in April 2019 by the Second Defendant, and its company articles were filed on 10 May 2019. The Second Defendant operates a website at URL: https://forensicnews.net ("**the Forensic News Website**"); the Twitter accounts under the username @ForensicNewsNet and @IntelPod; and the Facebook page under the username @ForensicNewsNet at the URL https://www.facebook.com/ForensicNewsNet/. The Forensic News Website uses a proxy registrant registered in Burlington, Massachusetts in the United States of America.

3.  The Second Defendant is domiciled in the State of California. He is currently employed as a 'social media strategist' by Stris & Maher LLP, a boutique law firm based in Los Angeles, CA, who conduct complex high-value litigation. He was first employed by Stris & Maher LLP in this role in or around April 2019, having graduated with a BA in Political Science and Government from the University of California in 2018. He has no formal journalistic training or qualifications. He founded the First Defendant in April 2019. He operates a personal Twitter account with the username @ScottMStedman and is the confirmed page owner of the Facebook page @ForensicNewsNet. The Second Defendant has previously had his account suspended by Twitter, and has been banned by Reddit, for violating their respective policies.

4.  The Third Defendant is domiciled in the State of California. He is a comedian and podcaster. He has no formal journalistic training or qualifications. He hosts a podcast for the First Defendant. He operates a personal Twitter account with the username @ericlevai.

5.  The Fourth Defendant is domiciled in the State of New York. He is a lawyer, having graduated from the Boston University School of Law in 2019, passed the New York Bar Examination in October 2019, then being admitted to the Bar of New York on 13 July 2020. He has no formal journalistic training or qualifications. He writes for the First Defendant, with his first by-line there being an article dated 19 May 2019. He operates a personal Twitter account with the username @jesskcoleman.

6.  The Fifth Defendant is domiciled in the Commonwealth of Pennsylvania, although is currently enrolled as a Juris Doctor candidate at Duke University School of Law in the state of North Carolina, having first studied political science at Fordham University graduating in 2016. He has

no formal journalistic training or qualifications. He is listed as a 'Researcher/Writer' for the First Defendant and is by-lined to articles published by the First Defendant as early as 28 August 2019. He operates a personal Twitter account with the username @RobertJDenault.

7.  The Sixth Defendant is domiciled in the State of Washington. He maintains a personal blog at https://richardsilverstein.com ("**the Silverstein Website**") and operates a personal Twitter account with the username @richards1052 and a publicly accessible Facebook profile at the URL https://www.facebook.com/richards1052. The Sixth Defendant has previously had his account suspended by Twitter for violation of their policies.

**WORDS COMPLAINED OF**

8.  The words complained of consist of 10 Publications which are set out in full in the First Appendix attached to these Particulars of Claim and identified below along with the respective first date of publication and web address, and are to be treated as having been pleaded here in full. All of the publications complained of, at the time of settling these Particulars of Claim, remain online.

**PUBLICATION**

9.  Publications 1 to 8 inclusive were published on the Forensic News Website, and Publications 9 and 10 were published on the Silverstein Website. Both websites are available to the public-at-large by use of an internet browser, and in particular are available within the jurisdiction of England & Wales. The words complained of in the publications set out above (Publications 1 to 10 and each of them) were read by a substantial but unquantifiable number of readers. Pending disclosure or further information from the Defendants, the Claimant is unable to state with precision the number of hits or views of the publications complained of, but will rely upon the following facts and matters to draw an inference that there has been substantial publication globally, including substantial publication within the jurisdiction:

    9.1.  The publications were extensively shared on social media websites, including the social news aggregator website www.reddit.com ("**Reddit**"), the social media website www.facebook.com ("**Facebook**") and the image sharing and social media service www.pinterest.com ("**Pinterest**"):

        9.1.1. Publication 1 was:

            9.1.1.1.    posted 167 times on Reddit; and

9.1.1.2.    was shared 239 times on Facebook.

9.1.2. Publication 2 was:

9.1.2.1.    posted 37 times on Reddit; and

9.1.2.2.    was shared over 1,000 times on Facebook.

9.1.3. Publication 3 was:

9.1.3.1.    posted 21 times on Reddit; and

9.1.3.2.    was shared 223 times on Facebook.

9.1.4. As to Publications 4 and 5 (a podcast and its transcript, respectively):

9.1.4.1.    Publication 4 was shared 7 times on Facebook; and

9.1.4.2.    The audio file of Publication 4 (and 5) was listened to at least 3,721 times.

9.1.5. Publication 6 was:

9.1.5.1.    posted 6 times on Reddit; and

9.1.5.2.    was shared 43 times on Facebook.

9.1.6. Publication 7 was:

9.1.6.1.    posted 37 times on Reddit; and

9.1.6.2.    was shared 49 times on Facebook.

9.1.7. Publication 8 was:

9.1.7.1.    posted 237 times on Reddit;

9.1.7.2.    was shared 577 times on Facebook; and

9.1.7.3.    shared once on Pinterest.

9.1.8. Publication 9 was:

9.1.8.1.    posted 9 times on Reddit; and

9.1.8.2.    was shared 638 times on Facebook.

9.1.9. Publication 10 was shared 20 times on Facebook.

9.2.    It can be inferred that individuals and potential business partners searching for the Claimant would be directed to the Forensic News Website and the Silverstein Website. In support of this contention, when searching for 'Walter Soriano' on Google.co.uk (as at the date of settling these Particulars of Claim), the Forensic News Website and the Silverstein Website appear prominently: https://forensicnews.net/tag/walter-soriano/, an automatic WordPress compilation of Publications 1 to 8 on the Forensic News Website, is the first result on the first page; and Publication 2 is the second result on the first page; Publication 10 is the first result on the second page; Publication 9 is the second result on the second page.

9.3.    The Defendants themselves extensively published hyperlinks to the publications on their own Twitter accounts and the Facebook account as set out in the Second Appendix to these Particulars of Claim.

9.4.    The Forensic News Website and the Silverstein Website both use Google Analytics, which records the number of unique hits for each of the publications complained of, and accordingly the Defendants will be able to provide accurate and precise figures for each of the publications and are put on notice that they should do so.

9.5.    The Defendants' respective social media accounts on Twitter and Facebook also had their tweets and posts published to a substantial audience, and the posts would have further been disseminated to the followers or friends of those who interacted, shared, or retweeted the posts made by them (as set out in the Second Appendix to these Particulars of Claim), and at the time of settling these Particulars of Claim the accounts had the following followers or friends:

9.5.1. the Twitter account @forensicnewsnet has 37,296 followers;

9.5.2. the Twitter account @ScottMStedman has 113,602 followers;

9.5.3. the Twitter account @EricLevai has 3,072 followers;

9.5.4. the Twitter account @JessKColeman has 2,715 followers;

9.5.5. the Twitter account @RobertJDeNault has 20,853 followers;

9.5.6. the Twitter account @IntelPod has 2,882 followers;

9.5.7. the Twitter account @richards1052 has 10,548 followers;

9.5.8. the Facebook page @ForensicNewsNet at the URL https://www.facebook.com/ForensicNewsNet/ has 1,949 people who like the page and 2,028 people who follow it; and

9.5.9. the Facebook profile of the Sixth Defendant at the URL https://www.facebook.com/richards1052 has 4,964 followers.

9.6. The claims below for breach of the General Data Protection Regulation, harassment and misuse of private information/invasion of privacy are brought in respect of global publication and processing and use of the claimant's personal data and/or information. The claims below in the torts of libel and malicious falsehood are, as required by law, brought only in respect of publication within the jurisdiction of England & Wales.

**Responsibility for Publication**

10. The responsibility for global publication in relation to each of the publications set out in the First Appendix to these Particulars of Claim are identified below:

10.1. Publication 1. The First and Second Defendants are responsible for the publication of Publication 1 and published it or caused it to be published on the Forensic News Website. Publication 1 was first published on 5 June 2019 and continues to be published online on the Forensic News Website and accessible to the public at large including within the jurisdiction.

10.2. Publication 2. The First, Second and Fourth Defendants are responsible for the publication of Publication 2 and published it or caused it to be published on the Forensic News Website. Publication 2 was first published on 14 July 2019 and remains online and accessible to the public at large including within the jurisdiction. On or before 4 August 2019 this publication was edited as identified in First Appendix.

10.3. Publication 3. The First and Second Defendants are responsible for the publication of Publication 3 and published it or caused it to be published on the Forensic News Website.

Publication 3 was first published on 19 July 2019 and remains online and accessible to the public at large including within the jurisdiction.

10.4.   Publication 4. The First, Second, Third and Fourth Defendants are responsible for the publication of Publication 4 and published it or caused it to be published on the Forensic News Website and, in relation to the audio file of the podcast, on the online audio distribution platform and player SoundCloud available at the URL https://soundcloud.com/counterpod/forensic-news-scott-stedman-and-jess-coleman-on-walter-soriano. Publication 4 was first published on 22 July 2019 and remains online and accessible to the public at large including within the jurisdiction.

10.5.   Publication 5. The First, Second, Third and Fourth Defendants are responsible for the publication of Publication 5 and published it or caused it to be published on the Forensic News Website. Publication 5 was first published on 22 July 2019 and remains online and accessible to the public at large including within the jurisdiction.

10.6.   Publication 6. The First, Second and Fourth Defendants are responsible for the publication of Publication 6 and published it or caused it to be published on the Forensic News Website. Publication 6 was first published on 26 July 2019 and remains online and accessible to the public at large including within the jurisdiction. Between 4 April 2019 and the date of settling these Particulars of Claim this publication was edited as identified in First Appendix.

10.7.   Publication 7. The First and Second Defendants are responsible for the publication of Publication 7 and published it or caused it to be published on the Forensic News Website. Publication 7 was first published on 1 August 2019 and remains online and accessible to the public at large including within the jurisdiction.

10.8.   Publication 8. The First, Second and Fifth Defendants are responsible for the publication of Publication 8 and published it or caused it to be published on the Forensic News Website. Publication 8 was first published on 16 June 2020 and remains online and accessible to the public at large including within the jurisdiction.

10.9.   Publication 9. The Sixth Defendant is responsible for the publication of Publication 9 in that he published it or caused it to be published on the Silverstein Website. Publication 9 was first published on 30 January 2020 and remains online and accessible to the public at large including within the jurisdiction.

10.10. Publication 10. The Sixth Defendant is responsible for the publication of Publication 10 in that he published it or caused it to be published on the Silverstein Website. Publication 10 was first published on 14 February 2020 and remains online and accessible to the public at large including within the jurisdiction.

**Natural & Ordinary Meanings**

11. The words complained of referred to the Claimant and the natural and ordinary meanings are as follows (by reference to the publication number set out in the First Appendix to these Particulars of Claim):

    11.1.   Publication 2 (both original and edited, 15 July 2019)

        11.1.1. the Claimant is guilty of receiving illegal kickbacks and other corrupt payments from the Russian state under the façade of security consultancy work for Sochi Airport during the Olympic Games held in 2014;

        11.1.2. the Claimant entered into a corrupt and secret business partnership, in the Universe Security Group, with the Prime Minister of Israel, Benjamin Netanyahu.

        Publication 2 (original, 15 July 2019)

        11.1.3. the Claimant is guilty of corruption and received a criminal conviction for corruption in Monaco following a corruption probe in 2018.

        Publication 2 (edited, on or before 4 August 2019)

        11.1.4. there are strong grounds to suspect the Claimant is guilty of corruption as he was charged with corruption in Monaco as part of a corruption probe in 2018.

    11.2.   Publication 3 (19 July 2019):

        11.2.1. the Claimant is guilty of multiple homicide.

    11.3.   Publications 4 and 5 (22 July 2019):

        11.3.1. the Claimant is guilty of engaging in money laundering using a company called Playland Investments LLC;

        11.3.2. the Claimant is the front man for a money laundering operation;

       11.3.3.  there are grounds to suspect the Claimant was involved in a conspiracy to interfere with the 2016 election in the United States.

11.4.   <u>Publication 6</u> (26 July 2019):

       11.4.1.  there are reasonable grounds to suspect the Claimant was involved in a conspiracy to interfere with the 2016 election in the United States;

       11.4.2.  there are grounds to suspect the Claimant is involved with the Russian mafia and embezzlement of Russian state funds.

11.5.   <u>Publication 7</u> (1 August 2019): there are strong grounds to suspect that the Claimant was involved in Russian election interference with the United States election in 2016.

11.6.   <u>Publication 8</u> (16 June 2020):

       11.6.1.  there are strong grounds to suspect that the Claimant was involved in Russian election interference with the United States election in 2016;

       11.6.2.  the Claimant is the middle man for a network of illegal Israeli hacking firms.

11.7.   <u>Publication 9</u> (30 January 2020):

       11.7.1.  the Claimant is an individual who makes illegal arrangements for corrupt oligarchs;

       11.7.2.  the Claimant hires hackers to illegally spy on his clients' enemies.

11.8.   <u>Publication 10</u> (14 February 2020):

       11.8.1.  the Claimant makes illegal arrangements for Oleg Deripaska and Israeli Prime Minister Benjamin Netanyahu.

**Further Meanings**

12. Insofar as the Single Meaning Rule applicable in the law of libel does not apply to claims in Malicious Falsehood or inaccuracy in the law of data protection, the words complained of at Publications 1 to Publication 8 inclusive (in the First Appendix attached to these Particulars of Claim) would have been understood by some or all readers or listeners, to mean the respective natural and ordinary meanings set out at paragraph 11 above and also the following further

meanings (by reference to the publication number set out in the First Appendix to these Particulars of Claim) which were intended and/or foreseen by the publishers and each of them:

12.1. in Publication 1:

12.1.1. the Claimant is an individual who makes illegal arrangements for Prime Minister Netanyahu;

12.1.2. the Claimant is known by the nickname "The Thug";

12.1.3. the Claimant is a criminally violent person.

12.2. in Publication 2:

12.2.1. the Claimant was a big donor to the Netanyahu campaign;

12.2.2. the Claimant was convicted in 2018 by Monaco authorities for corruption;

12.2.3. the Claimant was charged with corruption in 2018 by Monaco authorities;

12.2.4. the Claimant was a business partner with Prime Minister Netanyahu;

12.2.5. Ehud Barak did not apologise for saying the Claimant and Prime Minister Netanyahu were business partners;

12.2.6. the Claimant is a business partner with Simon Bird;

12.2.7. the Claimant is a business partner with Shlomo Rechtschaffen;

12.2.8. the Claimant's company had its contract with Graff Diamonds prematurely terminated following a diamond heist.

12.3. in Publication 3:

12.3.1. the Claimant was a Major in the Israeli army intelligence unit;

12.3.2. the Claimant has killed multiple people;

12.3.3. the Claimant has confessed to having killed multiple people.

12.4. in Publications 4 and 5:

12.4.1. There are strong grounds to suspect that the Claimant is the front man of a money laundering operation.

12.5. in <u>Publication 6:</u>

12.5.1. The Claimant directly employed a man, Maxim Skachko, who is guilty of embezzlement.

12.6. in <u>Publication 8:</u>

12.6.1. The Claimant was a Major in the Israeli army intelligence unit;

12.6.2. The Claimant had falsely claimed to be Major in the Israeli army intelligence unit;

12.6.3. The Claimant is an agent for a network of Israeli hacking and surveillance firms, providing private illegal hacking and spying services;

12.6.4. The Claimant worked directly for Oleg Deripaska and is his close consultant.

12.7. in <u>Publication 9:</u>

12.7.1. the Claimant is an individual who makes illegal arrangements for his clients;

12.7.2. the Claimant has worked directly for Oleg Deripaska;

12.7.3. the Claimant is an arms dealer;

12.7.4. the Claimant has been a debt collector for Dimitri Rybolovlev;

12.7.5. the Claimant paid off a Russian sex worker who threatened to release an audio tape of her relationship with Oleg Deripaska.

12.8. in <u>Publication 10:</u>

12.8.1. the Claimant worked directly for Oleg Deripaska and Israeli Prime Minister Benjamin Netanyahu.

**CLAIM IN DATA PROTECTION**

13. Paragraph 1 is repeated. The Claimant is a data subject within the meaning of article 4(1) of the GDPR. He is habitually resident in London, which is the centre of his interests.

14. Paragraphs 2 to 3 are repeated. The First and Second Defendants are data controllers within the meaning set out in the General Data Protection Regulation ("**GDPR**") and Data Protection Act 2018 ("**DPA 2018**") in respect of personal data processed by the creation and publication of the Forensic News Website, and all of its social media channels and ancillary publications.

15. Paragraphs 3 to 6 are repeated. The Third to Fifth Defendants are data processors on behalf of the First and Second Defendants within the meaning of GDPR and DPA 2018 in respect of personal data processed by the creation and publication of the Forensic News Website, and all of its social media channels and ancillary publications. The Second to Fifth Defendants are data controllers in respect of their Twitter accounts and Facebook pages pleaded at paragraphs 3 to 6 above.

16. Paragraph 7 is repeated. The Sixth Defendant is a data controller within the meaning set out in the GDPR and DPA 2018 in respect of personal data processed by the creation and publication of the Silverstein Website, and in respect of his personal Twitter account and Facebook profile.

17. The First and Second Defendants, as the data controllers of the Forensic News Website, are 'established' within the United Kingdom and Member States of the European Union for the purposes of Article 3(1) GDPR insofar as the website is targeted at readers in those jurisdictions:

    17.1. the content of the Publications is in English;

    17.2. the Forensic News Website includes a 'Support Our Work" link, which in turn provides links to the First Defendant's account on PayPal (https://www.paypal.com/paypalme/forensicnews) whereby donations to the First Defendant, solicited by it from readers, can be denominated in GBP (the currency unit for the United Kingdom), EUR (the currency unit of the Eurozone), DKK (the currency unit of the Kingdom of Denmark);

    17.3. On 7 August 2020 at 12:08am, the Twitter account of First Defendant with the username @ForensicNewsNet published the following tweet, targeting those within the jurisdiction, (and which was retweeted by the Second Defendant using his Twitter account @ScottMStedman on the same day):

    > *Everyone in the UK or EU can now pledge to Patreon in their local currency of Euros or Pounds. This will help prevent you paying extra conversion fees from your bank.*

*https://t.co/mbDnXEeNYd?amp=1* [URL directing to the Forensic News membership page on Patreon, a membership platform providing subscription content service, at the URL https://www.patreon.com/forensicnews]

17.4.  The Forensic News Website includes a 'Store' with its own branded merchandising, which accepts Shipping Addresses in the United Kingdom and Member States of the European Union, thereby providing eCommerce services to citizens within the EU; and

17.5.  the Forensic News Website places cookies on readers' devices, and processes their personal data using Facebook and Google Analytics. Facebook and Google are joint data controllers in respect of the analytic processing of personal data, and insofar as the reader is in the United Kingdom and/or the European Union, the registered joint data controller is Facebook Ireland Ltd and Google Ireland Ltd.

18.  Further and alternatively, Article 3(2) GDPR applies to the First to Sixth Defendants, insofar as they are data controllers, on the basis that all of them:

18.1.  offer services to readerships in the United Kingdom and the European Union, irrespective of whether payment of the data subject is required, and process the personal data of such readers based in the UK and/or EU through use of cookies; and

18.2.  are monitoring the behaviour of the Claimant, a data subject, insofar as such behaviour takes place within the UK and/or EU.

19.  The First to Sixth Defendants and each of them are required to comply with the principles for processing personal data set out in Article 5(1) of the GDPR ("**the Principles**"). The Principles include the requirements that personal data shall be:

19.1.  pursuant to Article 5(1)(a) GDPR, processed lawfully, fairly and in a transparent manner in relation to the data subject. This requires data processing comply with one or more of the requirements contained in Article 6 GDPR;

19.2.  pursuant to Article 5(1)(d) GDPR, accurate and, where necessary, kept up to date; every reasonable step must be taken to ensure that personal data that are inaccurate, having regard to the purposes for which they are processed, are erased or rectified without delay.

20.  Paragraphs 8 to 12 are repeated. The information in the meanings set out at paragraphs 11 and 12 above, which is contained in the publications set out in the First Appendix to these Particulars of Claim, constituted the Claimant's personal data (the personal data set out therein in relation to

Publication 1 to 8 and each of them are "**the Forensic News Personal Data**" and the personal data set out therein in relation to Publication 9 and 10 are "**the Silverstein Personal Data**"; the Forensic News Website Personal Data and the Silverstein Personal Data are collectively "**the Personal Data**").

21. The obtaining, editing, storing and publishing of Publications 1 to 8 and each of them constituted the processing of the Forensic News Personal Data by the First to Fifth Defendants in breach of the GDPR.

22. In breach of Article 5(1)(d) of the GDPR, the First to Fifth Defendant's processing of the Forensic News Personal Data was inaccurate:

## PARTICULARS OF INACCURACY

22.1.    in relation to Publication 1:

22.1.1.    the Claimant is a family friend of Prime Minister Netanyahu, dating from decades before Mr Netanyahu became Prime Minister, and nothing more;

22.1.2.    the Claimant is not known by the nickname "The Thug" – this is a mistranslation of his alleged nickname "The Body Builder", coined on account of his physique – nor is he criminally violent.

22.2.    in relation to Publication 2:

22.2.1.    the Claimant did not receive any kickbacks or illegal payments from the Russian state in relation to the Sochi airport contract. Nor has the Claimant ever had contact with the Kremlin or Mr Putin in relation to the Sochi Airport contract, and nor has he ever had contact with either the Kremlin or Mr Putin;

22.2.2.    the Claimant has never donated to the Netanyahu campaign or to Netanyahu's political party, Likud;

22.2.3.    the Claimant was not charged or convicted for corruption in Monaco in 2018 nor anywhere else;

22.2.4.   the Claimant was a not a business partner of Prime Minister Netanyahu;

22.2.5.   Ehud Barak did apologise for saying the Claimant and Prime Minister Netanyahu were business partners and publicly stated that his statement had been inaccurate. His apology is still available on Twitter at https://twitter.com/barak_ehud/status/1150387587904942086;

22.2.6.   the Claimant is not a business partner with Simon Bird or Shlomo Rechtschaffen. Shlomo Rechtschaffen is the Claimant's lawyer;

22.2.7.   the Claimant's company's contract with Graff Diamonds was not terminated due to the robbery or otherwise, but ended on the date it was due to finish. Indeed, the contract had been extended for a few additional months over the original stipulated termination time.

22.3.   in relation to Publication 3:

22.3.1.   the Claimant has not killed multiple people, nor has he claimed to have killed multiple people, and nor has he ever killed a person;

22.3.2.   the Claimant is not and was not a Major or any other rank of officer in the intelligence divisions of the Israeli Army, and has not falsely claimed to so have been.

22.4.   in relation to Publication 4 and 5:

22.4.1.   the Claimant has not engaged in money laundering through Playland Investments LLC nor has he engaged in any money laundering whatsoever;

22.4.2.   the Claimant is not a front man for a money laundering operation;

22.4.3.   the Claimant had no involvement in any Russian interference in the 2016 Presidential election, nor in any elections wheresoever.

22.5.   in relation to Publication 6:

22.5.1.   the Claimant had no involvement in any Russian interference in the 2016 Presidential election nor has he been involved ever in interfering with any other elections elsewhere;

22.5.2.   the Claimant has never embezzled money from the Russian State;

22.5.3.   Maxim Skachko was one of many sub-contractors to one of the Claimant's companies, and he was not directly employed by the Claimant.

22.6.   in relation to <u>Publication 7</u>:

22.6.1.   the Claimant had no involvement in any Russian interference in the 2016 Presidential election, nor in any elections wheresoever;

22.7.   in relation to <u>Publication 8</u>:

22.7.1.   the Claimant is not and was not an intelligence officer of the Israeli Army or otherwise, and has not falsely claimed to be;

22.7.2.   the Claimant did not work as a direct consultant to Oleg Deripaska. The Claimant's company was contracted by Sochi Airport. Nor did the Claimant work for Benjamin Netanyanhu.

23. In breach of Article 5(1)(a) of the GDPR, the First to Fifth Defendant's processing of the Personal Data was unlawful in that it did not meet any of the conditions under Article 6 of the GDPR and was also unfair, and unlawful in that the publication of Publication 1 to 8 and each of them constituted malicious falsehood, harassment, an intrusion/invasion of privacy, and in relation to Publications 2 to 8 and each of them, libel, as pleaded below.

24. Further, the processing of criminal conviction data in Publication 2, that the Claimant was convicted in 2018 by Monaco authorities for corruption (which, as the Claimant sets out above is false and inaccurate), is also a breach of Article 10 GDPR by the First Defendant in that there was no lawful basis for processing under that Article.

25. Publication 2 was, at a time unknown after its first publication, edited to alter the statement that the Claimant was charged (rather than convicted) by Monaco authorities for corruption in 2018. This again is in breach of Article 10 GDPR by the First Defendant and there is no lawful basis for processing.

26.     In breach of Article 44 of the GDPR, the First and Second Defendants provided the Third
        to Fifth Defendants access to archives containing the Claimant's personal data. The
        background and facts in relation to this unjustified transfer are set out below:

26.1.   On 7 February 2018, Commissioner of the Israeli Police, Roni Alsheich stated in an
        interview on Israeli television that 'powerful factors' were conducting surveillance
        activities around the police investigators that were beginning an investigation into
        Prime Minister Benjamin Netanyahu. The Commissioner did not name who these
        'Powerful Factors' were.

26.2.   On 11 February 2018 on a live radio interview, the Israeli reporter Raviv Drucker, an
        outspoken opponent of Prime Minister Netanyahu, said the 'powerful factors'
        referred to by the Commissioner referred to the Claimant. He had no evidence that
        this was the case.

26.3.   On 18 February 2018 the Claimant sent a letter before action requesting a retraction
        and apology from Mr Drucker. Mr Drucker refused to do so.

26.4.   The Claimant issued Israeli proceedings in libel on 19 February 2018 against Raviv
        Drucker over allegations published by him that the Claimant had been involved in
        illegal activity.

26.5.   The Commissioner Roni Alsheich confirmed in an official letter on 25 February 2018
        that he did not and was not referring to the Claimant in his interview on the TV
        program Uvda on 7 February 2018 and emphasised that he was not responsible for
        the false representations made in linking the Claimant to his previous comments, and
        that had solely been done by the publisher, i.e. Raviv Drucker.

26.6.   In May 2018 lawyers of the Claimant and Mr Drucker agreed to attempt a mediation
        process to settle the dispute between them. Attempts at mediation continued between
        May 2018 until March 2019.

26.7.   In March 2019, Mr Drucker threatened the Claimant, directly and indirectly, stating
        that there would be serious repercussions against the Claimant if he did not drop the
        lawsuit against him. Mr Drucker described these repercussions as an 'Armageddon
        Plan' and/or as "the Final Judgment Day" which included releasing information about
        the Claimant into the public domain.

26.8.   Soon after Mr Drucker made these threats, attempts at mediation failed.

26.9.   A few days after mediation attempts had failed, Guy Meroz, a colleague of Raviv Drucker at Channel 13 (an Israeli news channel), informed the Claimant's lawyers that he intended to dedicate an episode of an investigation programme to the Claimant.

26.10. The Claimant's lawyers wrote to Channel 13, noting that this programme was clearly the result of the threats made by Raviv Drucker. The claimant sent a letter before action to Channel 13, and the programme was never broadcast; as far as the Claimant is aware, it was never produced.

26.11. Soon after the defence in the claim against Mr Drucker was filed, on 19 April 2019 two defamatory articles were published by an Israeli news website which is linked to Mr Drucker called the Seventh Eye (which maintains a website at www.the7eye.org.il) on 23 and 24 April 2019, quoting from and developing, without basis, the defence, relying on privilege in reporting legal proceedings (the Claimant has subsequently brought legal proceedings in respect of these articles against Mr Drucker and the Seventh Eye). Further, around the time the defence in the claim against Mr Drucker was filed, on 19 April 2019, a database of legal documents relating to other legal claims, including those that were entirely obsolete, unrelated and discontinued claims, brought by the Claimant in Israel (including statements of case and witness statements) and other documents from the Claimant's company ("**the Archive**") was compiled by Mr Drucker and the Seventh Eye.

26.12. This Archive contained the Claimant's personal data and his private information.

26.13. It can be inferred that prior to the publication of material from the Archive online (by the Seventh Eye on 17 July 2019), the First and Second Defendants were given full access to the Archive, directly or indirectly, and far in advance, by Mr Drucker and/or Seventh Eye. This is first referred to in Publication 3 (first published on 19 July 2019, only 48 hours after the Archives were published online) where the Second Defendant said "*A treasure trove of Israeli court documents and internal USG Security Group files were recently shared by a source on the condition of anonymity to Forensic News given the highly sensitive nature of the information. The details in this article are just the beginning of a series we are going to dub the Walter Soriano files.*" It can be inferred from this and the timing of the publication and the detail in Publication 3 that access to the Archive was obtained by the First and

Second Defendants long before Publication 3 was published. The "WALTER SORIANO FILES" is included in the heading of Publications 3, 6 and 7, and those publications were sourced from the Archive. The reporting in these publications included detailed financial data and information about the Claimant from the Archive that had been gathered and analysed. During the first five months since the creation of the Forensic News Website, a substantial proportion of the articles posted concerned the Claimant.

26.14. The Archive and its provenance, and the link to the Israeli litigation is referred to by the First to Fourth Defendants in Publications 4 and 5:

> *"[00:43:37]*
>
> *Yeah. So he's he's pretty much suing everyone that he has contact with. And we certainly we stand with our Israeli friends who who are being sued. And we'll be we'll be sure to mention their reporting and all of our pieces. Yeah. We have we have a ton of data that we're preparing to section off into articles and post a series of vex poses that we're calling the Walter Soriano files.*
>
> *[00:44:05]*
>
> *I love. Great. I just just honestly just great. You know, while while the journalism is serious, I also think as someone who came from a just the general entertainment perspective, it's important to present things in a certain way that grabs the reader. And I just. That's a great title, guys."*

26.15. Subsequently to it being transferred to them, the First and Second Defendants provided the Third to Fifth Defendants access to the Archive.

26.16. The transfer of the Claimant's personal data in the Archive from Israel to the First to Fifth Defendants in the United States constituted a transfer of personal data to a third country which underwent processing contrary to Article 44 of the GDPR.

26.17. Israel benefits from an adequacy decision from the European Commission under Article 45 of the GDPR. The United States – not having a full adequacy decision – operated data transfers from the EU to the US under Decision 2016/1250 ("the Privacy Shield Framework"). The Privacy Shield Framework was declared invalid by the Court of Justice of the European Union on 16 July 2020 in the case of *Data Protection Commissioner v Facebook Ireland & Maximillian Schrems* (Case 311/18) ("**Schrems II**").

26.18. No derogations under Article 49 of the GDPR apply to the processing of the Claimant's personal data by the First to Fifth Defendants. The continued processing of the Claimant's personal data, in the form of the Archive, in the United States was unlawful *ab initio*, alternatively became unlawful as at the date of the decision of the Court of Justice of the European Union on 16 July 2020.

27. The obtaining, editing, storing and publishing of Publication 9 and 10 constituted the processing of the Silverstein Personal Data by the Sixth Defendant in breach of the GDPR.

28. In breach of Article 5(1)(a) of the GDPR, the Sixth Defendant's processing of the Personal Data was unlawful in that it did not meet any of the conditions under Article 6 of the GDPR and was also unfair, and unlawful in that the publication of Publication 9 and 10 libel, harassment, and an intrusion/invasion of privacy.

29. In breach of Article 5(1)(d) of the GDPR, the Sixth Defendant's processing of the Silverstein Data was inaccurate:

### PARTICULARS OF INACCURACY

29.1.    in relation to Publication 9:

29.1.1.    the Claimant has not worked directly for Oleg Deripaska. The Claimant's company was once contracted, directly, by Sochi Airport authorities in which Deripaska has an interest.

29.1.2.    the Claimant is not an arms dealer.

29.1.3.    the Claimant has not been a debt collector for Dimitri Rybolovlev or any other person.

29.1.4.    the Claimant did not pay off a Russian sex worker who threatened to release an audio tape of her relationship with Oleg Deripaska.

29.2.    in relation to Publication 10:

29.2.1.    the Claimant did not work directly for Oleg Deripaska or make arrangements for him. The Claimant's company was contracted by Sochi Airport authorities.

**CLAIM IN MALICIOUS FALSEHOOD**

30. Paragraphs 1 to 3 and paragraphs 8 to 12 are repeated. Insofar as he is required by law to do so, the Claimant limits his malicious falsehood claim to causes of action committed by publication within the jurisdiction of England & Wales. The claim in malicious falsehood is brought only against the First and Second Defendant in respect of Publications 1 to 8 inclusive, excluding publication of Publication 1 between 5 June 2019 and 13 July 2019. It can be inferred that there was substantial publication of these posts within the jurisdiction of England and Wales, and paragraph 9 is repeated.

31. The words complained of that have been set out in the First Appendix to these Particulars of Claim (Publications 1 to 8 and each of them) were published by the First and Second Defendants knowing (or readily appreciating) and thereby intending that they would be understood to bear the meanings set out at paragraphs 11 and 12 above, and in those meanings, which would have been understood by some or all readers, the words complained of were false and published maliciously.

32. Alternatively, the words complained of within the publications were published by the First and Second Defendants recklessly, not caring whether they were true or false and with no honest belief that they were true and in those meanings the words complained of were false and published maliciously.

**PARTICULARS OF FALSITY**

33. The meanings referred to and set out above are false. Paragraph 22 above, setting out the falsity of the meanings at paragraphs 11 and 12, is repeated.

**PARTICULARS OF MALICE**

34. Paragraph 26 is repeated. The campaign of defamation, malicious falsehood, invasion of privacy, breach of data protection rights and harassment against the Claimant is being conducted on behalf of Mr Drucker in fulfilment of his threat to unleash the 'Armageddon Plan' because the Claimant refused to discontinue the Israeli libel proceedings. The facts in paragraphs 26.1 to 26.12 were known to the Second Defendant.

35. Paragraphs 1, 2 and 26.11 are repeated. The Second Defendant founded the First Defendant as a website on 20 April 2019, the same month he was first employed as a "social media strategist" at a law firm, and shortly after Mr Drucker's defence in Israel was filed on 19 April 2019, and the

same month the Seventh Eye began publishing material from the court case between the Claimant and Raviv Drucker, on 23 and 24 April 2019.

36. The same month, April 2019 the Second Defendant's co-author of an article in *The Atlantic* magazine, the journalist Natasha Bertrand, moved (on or around 15 April 2019) to cover national security *Politico*. The same month she praised the Second Defendant publicly on Twitter and recommended that people buy his book. On 5 June 2019, she published an exclusive concerning the 5 April 2019 letter from the US Senate Intelligence Committee to the Claimant's business address, which provided the basis for further articles by the First and Second Defendant on his new website. It is to be inferred that the Second Defendant, on behalf of and/or in concert with Mr Drucker and/or the Seventh Eye, provided information about the Claimant to his former co-author Ms Bertrand to raise the profile of the Claimant, with the view of furthering his campaign of harassment against the Claimant.

37. The provision of the Archive from Israel to the First and Second Defendant is admitted in Publications 3, 4 and 5. Publication 3 is dated 19 July 2019, and so the Archive must have been provided to the First and Second Defendant within days or weeks of it being compiled by Mr Drucker or at his behest. At the time of the Archive being provided, the First Defendant was a brand new website which had not yet published more than a handful of articles, and was run by the Second Defendant whose journalistic by-lines at major media outlets numbered just two by-lined credits with staff journalists (Natasha Bertrand at *The Atlantic* and Jon Swaine at *The Guardian*). It is to be inferred that the Second Defendant and his brand-new website were chosen as the US-based recipient of the Archive not because of the Second Defendant's journalistic *bona fides* but because he was prepared to publish wantonly and irresponsibly at the instruction of Mr Drucker and/or Seventh Eye (Seventh Eye having created its English language Twitter page on or around 20 June 2019) for the purpose of harming the Claimant. The Archive was transferred and received unlawfully, in breach of the law of confidentiality, privacy and data protection, as the Second Defendant well knew.

38. The Claimant had previously been quoted in the Anglophone media on a single occasion, in 2010, when he was quoted in his capacity as spokesman for Diego Maradona in relation to the possibility that Maradona would take over Aston Villa FC. The Claimant was not a public figure, nor was there any information about his personal or current professional life in the public domain. Yet of the first 14 articles published by the First Defendant up until 1 August 2019), 5 were about the Claimant and a further 4 were articles to which the Second Defendant was not by-lined, meaning

half of those first 10 articles on the First Defendant's website which carried the by-line the Second Defendant were about the Claimant.

39. The First Defendant was not set up as a *bona fide* news outlet: it was set up with the specific purpose of laundering information about the Claimant into the public domain, both to cause his distress and pecuniary loss and/or to render him a 'public figure' and so making it significantly harder for him to bring defamation proceedings in the United States, under the doctrine in *New York Times v Sullivan*, whereby 'public figures' must prove express malice.

40. To the extent that the Second Defendant engaged in any independent fact-checking at all, which is not admitted, it failed to uncover the large number of factual inaccuracies set out at Paragraph 22, and so was not merely negligent but positively reckless, having no regard for the truth or falsity of the allegations made against the Claimant. Given the seriousness of the meanings at paragraphs 11 and 12, there was a high burden on the Second Defendant to verify the information. Yet the Second Defendant did not provide the Claimant with a proper opportunity to answer the inaccurate and defamatory allegations, and failed to include comment on his behalf. In support of his plea of malice, including *Loutchansky* malice in respect of continued publication, the Claimant relies on the ignoring of unequivocal factual statements included in correspondence on the Claimant's behalf from his lawyer. Indeed, when the Second Defendant sent the Claimant's lawyer a request for comment on 15 May 2019, the request was responded to in its entirety with definitive answers by the Claimant's lawyer and the Second Defendant was made unambiguously aware of the falsity of the allegations. Despite this, the First and Second Defendants went on to publish the allegations without varnish and despite the fact that they were aware of their falsity.

41. The Second Defendant has orchestrated a campaign of harassment by publication, and taken glee in publishing photographs of the Claimant, including a photograph ripped from the social media accounts of a child in his family. It is to be inferred from the tone and content of the words complained of that the Second Defendant is actuated by malice.

42. Insofar as the allegations, including defamatory allegations, are centred on the Claimant's professional life, they are calculated to have a pecuniary effect on his businesses and that of his companies. The Claimant will rely upon section 3(1), Defamation Act 1952. The publication of the words complained of contained within the publications set out above was calculated to cause pecuniary damage to the Claimant in respect of his role as a businessman. The Claimant will rely on, *inter alia* the fact that the malicious falsehoods target and predominantly concern the Claimant's

businesses, name and identify them; and that receipt of the allegations complained of would make it highly unlikely that the recipient would enter into business with the Claimant or use his services.

43. The Second Defendant, acting in concert with and/or on behalf of Mr Drucker and/or the Seventh Eye, is actuated by motive malice, with the intent of causing the Claimant pecuniary loss as well as distress in relation to the invasion of his personal privacy.

44. In the premises, the publication of the words complained of in Publications 1 to 8, and each of them, was malicious on the part of the First and Second Defendant.

## CLAIM IN LIBEL

### Publication

45. Paragraphs 1 to 12 are repeated. The Claimant limits his libel claim to causes of action committed by publication within the jurisdiction of England & Wales. The Claimant does not sue in the tort of libel in respect of Publication 1.

### Defamatory Meaning & Reference to the Claimant

46. The words published in Publication 2 to Publication 10 and each of them, as set out in full in the First Appendix to these Particulars of Claim and referred to above, referred to the Claimant and were defamatory of him in the respective natural and ordinary meanings set out at paragraph 11 above, and the relevant sub-paragraphs therein.

### Serious Harm

47. The publication of the words complained of in relation to Publications 2 to 8 and each of them referred to above and set out in the First Appendix to these Particulars of Claim have caused or are likely to cause serious harm to the Claimant's reputation. In support of this contention the Claimant will rely, amongst other things, on the following:

47.1. the allegations against the Claimant made in the words complained of are self-evidently serious, including grave criminality and attack his personal and professional integrity;

47.2. the allegations attack the Claimant as a corrupt businessman. These allegations directly impact the Claimant's professional reputation and his business activities. His reputation is crucial to his business;

47.3. paragraphs 8 and 9 above are repeated. The words complained of were published to a substantial audience in this jurisdiction; and

47.4. it can be inferred that the allegations complained of have inevitably spread amongst others, and the Claimant relies on the 'grapevine effect'. For instance, the publications on the Forensic News articles formed the basis of coverage of the Claimant in *The Sunday Telegraph*, in an article published on 25 January 2020 as well as online, available on *The Telegraph* website at the URL https://www.telegraph.co.uk/news/2020/01/25/maradonas-ex-agent-row-senate-inquiry-russian-election-interference/.

48. In addition to the serious reputational harm suffered as set out above, the publications and each of them have caused the Claimant distress and embarrassment. Paragraph 57 below is repeated, including in support of his claim for general and aggravated damages.

## CLAIM IN HARASSMENT

49. Paragraphs 1 to 48 are repeated. The Defendants and each of them have pursued a course of conduct which amounts to harassment of the Claimant contrary to sections 1 and 3 of the Protection from Harassment Act 1997 and which they knew or ought to have known amounted to such:

49.1. As is set out in the Second Appendix to these Particulars of Claim the Defendants and each of them have published a large number of social media posts on Twitter and Facebook. The Second Appendix sets out each social media post by number, the content of the post, the date of the post, whether the post was favourited/interacted with, retweeted/shared and if there was any media attached to the post. There are often several in one day. The common theme of all of these is that the Claimant is corrupt. The Claimant relies upon the entirety of the matters and publications set out in the Second Appendix.

49.2. The repeated publication of defamatory material about him online has, and continues to, alarm and distress the Claimant.

49.3. Further, the Claimant will rely on the following characteristics of the campaign of harassment:

49.3.1. the Defendants appear to coordinate their posts and support or re-tweet each other when publishing information about the Claimant and/or the Publications, as can be

seen from the Second Appendix to these Particulars of Claim and amounts to a
concerted campaign of 'cyberbullying' across a variety of online media;

49.3.2. there have been an enormous number of publications made by the Defendants about
the Claimant, as set out in the appendices. The barrage is persistent and unrelenting;

49.3.3. the wide-ranging and seriously defamatory nature of the allegations made, as set out
above; and

49.3.4. the manner in which the Defendants published the Claimant's private information,
and invade/intrude into his privacy, knowing that the Claimant was a private
individual and greatly valued his right to privacy. The Claimant will rely on *inter alia*
the contumelious manner in which the First to Fourth Defendants and each of them
referred to the disclosure of private photographs of the Claimant in Publication 4
and Publication 5 in Appendix 1 to these Particulars of Claim and paragraphs 52 to
56 below.

50. Further or alternatively, the Defendants and each of them has aided and abetted the Second
Defendant in pursuing the course of conduct set out above and is therefore liable for that conduct
themselves (pursuant to s.7(3A) of the Protection from Harassment Act 1997).

51. The Defendants' course of conduct was calculated to cause, and has caused, alarm and distress to
the Claimant. Paragraph 57 below is repeated.

**CLAIM IN PRIVACY**

52. Paragraphs 1 to 51 are repeated. In publishing the words complained of above, and as set out in
the First and Second Appendices to these Particulars of Claim, and publishing photographs of the
Claimant therein, the Defendant has unlawfully intruded into the Claimant's private life, and
misused the Claimant's private information, being the information about him which constitutes
his personal data as contained in Publications 1 to 10.

53. The Claimant is a private individual. Prior to the information complained of, there was minimal
information available online about the Claimant's private and family life. The Claimant was not a
public figure, nor was he involved in party political matters, and had sought to protect his private
and family life. To his knowledge, he has never been investigated by any law enforcement entity
worldwide.

54. The Defendants' conduct in placing information about the Claimant's private life online, as set out above, constitutes an invasion into his privacy and each subsequent article from Publication 1 and social media post constituted a further intrusion into this private life. The Claimant relies on each publication as set out in the appendices to these Particulars of Claim as discrete instances of intrusion into the Claimant's private life.

55. In particular, the photographs of the Claimant are self-evidently private, and the Claimant had a reasonable expectation that they would remain private. The Defendants were aware that the Claimant avoided publicity and protected his private life, and that there were no photographs of him online (prior, that is, to the invasion of privacy by the Defendants and each of them). Indeed, the Second Defendant was suspended from Twitter on 24 July 2020 for posting private photographs of the Claimant as they violated Twitter's privacy policy. The Claimant's private photographs were flagrantly and unjustifiably published, with Publication 2, amongst others, noting the photographs of the Claimant were "*the first images ever published*" of the Claimant. The photographs include those of the Claimant with his children. The publication of each such photograph by the Defendants strikes at the heart of the Claimant's private and family life, and which magnifies the invasion of the Claimant's privacy, directly targeting as they do his children and family. The Defendants, in using photographs of the Claimant and his family in the Publications also set these photographs as primary photographs to populate previews of URLs (in particular Publication 2, Publication 3 and Publication 10), and so further published the photographs on Twitter whenever the URL of the Publications that included the photographs were published or shared on Twitter.

56. By reason of the above-mentioned intrusion and/or invasion of privacy, the Claimant has suffered considerable distress and alarm. Paragraphs 32 to 44 (above) and 57 (below) are repeated.

## REMEDIES

### Damages

57. Paragraphs 1 to 56 are repeated. In support of his claims for damages and/or aggravated damages in all of the aforementioned causes of action, the Claimant will rely on the following:

    57.1.  the matters set out above, and in particular Paragraphs 32 to 44 are repeated;

    57.2.  the allegations are self-evidently extremely serious and their publication on the Forensic News Website and the Silverstein Website in the manner and form they have been published

are designed to damage the Claimant, invade his privacy, and harass him. That is the intention and that has caused distress to the Claimant;

57.3.    as a result of the Defendants' actions, the Claimant has been forced to present explanations to his family members, business partners and companies who demanded explanations for the contents of the publications and their context. The Compliance Departments of banks have required the Claimant to rebut the false and defamatory allegations made in the Publications, which has required the Claimant to incur considerable expenses;

57.4.    the Defendants have failed to remove the material currently online and to apologise. Their responses to the Claimant were desultory and inadequate;

57.5.    the Defendants have continued their campaign of defamatory publications and harassment against the Claimant notwithstanding his complaints; and

57.6.    the extent of publication of the matters complained of has been substantial and the publication of the defamatory allegations has caused the Claimant very serious harm. Paragraphs 8 to 9 and sub-paragraphs therein are repeated.

**Injunction and other relief**

58.    The Defendants and each of them have failed or refused to provide undertakings not to repeat the allegations. Unless the Defendants provide satisfactory undertakings in the meantime, the Claimant will at the trial of this action seek an injunction to restrain the Defendants and each of them from (i) further publishing the same or similar words defamatory of the Claimant, (ii) publishing further malicious falsehood (in respect of the First and Second Defendants only); (iii) further harassing the Claimant; (iv) further intruding and/or invading the Claimant's privacy; (v) further processing the Claimant's personal data contrary to the requirements of the GDPR and DPA 2018.

59.    If judgment is ordered in the Claimant's favour he will seek an order under section 12(1), Defamation Act 2013 that the Defendants and each of them must publish a summary of the judgment in such manner and form and for such duration as the Court shall deem appropriate.

60.    The Claimant will also seek an order for the Court to order the removal of the statements complained of in respect of third parties under section 13(1) Defamation Act 2013.

**AND THE CLAIMANT CLAIMS:**

a. Damages, including aggravated damages, for malicious falsehood against the First and Second Defendants in respect of Publications 1 to 8 and each of them insofar as published within England & Wales;

b. An injunction to restrain the First and Second Defendants, whether acting by themselves, their servants or agents or otherwise howsoever from further publishing the said or any similar falsehoods of and concerning the Claimant within England & Wales;

c. Damages, including aggravated damages, for libel in respect of Publications 2 to 10 and each of them insofar as they are responsible for publication of the same and insofar as published within England & Wales against all the Defendants and each of them;

d. Damages, including aggravated damages for distress caused by (i) harassment and (ii) for misuse of the Claimant's private information and/or intrusion/invasion into the Claimant's privacy by publication; in respect of Publications 1 to 10 and each of them and the social media posts;

e. Compensation for all damage and/or distress and loss of control over his personal data, pursuant to Article 82(1) of the GDPR and section 168 Data Protection Act 2018, against the Defendants and each of them for breach of the statutory duty to process the Claimant's personal data in accordance with Articles 5, 6 and 10 of the GDPR in respect of the relevant Publications and social media posts;

f. An injunction (i) to restrain the Defendants whether by themselves, their employees or agents or otherwise howsoever, from further publishing or causing to be published the same or similar words or images defamatory of the Claimant within the jurisdiction of England & Wales; (ii) to restrain the Defendants from pursuing the same or any similar course of conduct which amounts to harassment of the Claimant and (iii) to restrain the Defendants from further intruding into and/or invading the privacy of the Claimant;

g. An order under Articles 17 and 21 of the GDPR and/or section 167 of the Data Protection Act 2018 prohibiting the unlawful processing of the Claimant's personal data and requiring the destruction/erasure of the same;

h. An order under section 12(1), Defamation Act 2013 that the Defendants publish the summary of any final judgment of the court in this action;

i.  An order under section 13(1) of the Defamation Act 2013 for the Court to order the operators of websites on which the Publications are posted or republished to remove the statements complained of; and

j.  Further or other relief as appropriate.

**GREG CALLUS**

**BEN HAMER**

**5RB**

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in this Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am authorised to sign the statement of truth on behalf of the Claimant.

Signed: ...........................................

Name: SHLOMO RECHTSCHAFFEN

Position or office held: Principal Solicitor

Dated this 16. day of August 2020